IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
September 24, 2004 Session

## IN RE E.J.M., d.o.b. 10/31/1994

## LEE T. MYERS v. SANDRA BROWN

**An Appeal from the Juvenile Court for Shelby County**
**No. G2405    Herbert Lane, Special Judge**

_____

**No. W2003-02603-COA-R3-JV - Filed March 10, 2005**

_____

This is petition to modify custody. The mother and father of the minor child were never married. In April 2002, when the child was seven years old, the trial court entered a consent order designating the mother as the primary residential parent of the child and giving the father residential time. During the summer of 2002, the parties became embroiled in a dispute over which school and in what grade the minor child should be enrolled for the upcoming school year. Against the father's wishes, the mother took the child out of the third grade at a public school and enrolled her in the second grade at a private school. The father filed a petition for contempt, and the trial court ordered the mother to return the child to her class at the public school pending a final resolution of the father's petition. The mother did not do so. The father then sought a change in custody. The trial court granted the father temporary custody pending a final resolution. The father retained temporary primary custody for the remainder of the school year. The trial court then held a hearing on the father's request to be permanently designated primary residential parent. After a hearing, the trial court restored the mother as primary residential parent, determining that the circumstances did not warrant a change in designation as primary residential parent. The father now appeals. We affirm the trial court's finding that the father did not show sufficient change in circumstances to remove mother as primary residential parent.

**Tenn. R. Civ. P. 3 Appeal as of Right; Judgment of the Juvenile Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, J., and DAVID R. FARMER, J., joined.

Mitchell D. Moskovitz and Adam N. Cohen, Memphis, Tennessee, for the appellant, Lee T. Myers.

Melanie E. Taylor, Memphis, Tennessee, for the appellee, Sandra Brown.

## OPINION

Petitioner/Appellant Lee T. Myers, D.D.S. ("Father"), and Respondent/Appellee Sandra Brown ("Mother") are the natural parents of the minor child, a daughter, E.J.M., born October 31, 1994. The parents were never married. Mother is a single mother, and E.J.M. is her only child. She worked for Methodist Alliance in Bartlett, Tennessee, in the pharmacy. Father is a dentist, self-employed, married since approximately 2000 to Iris Myers, a teacher. Father and his wife live in Collierville, Tennessee, and have one child several years younger than E.J.M. Father has a son older than E.J.M. from a prior relationship who lives with his mother.

On June 20, 1995, Mother and Father filed a voluntary acknowledgment of Father's paternity in the Juvenile Court. In accordance with the voluntary acknowledgment, the Juvenile Court entered an order of legitimation. The order made no designation of primary residential parent. E.J.M. continued to live with Mother, as she had since her birth.

On February 15, 1996, Mother filed a petition to modify the order of legitimation to include child support and insurance.[1] On March 20, 1996, Father filed a response stating that, pursuant to the parties' agreement, he had been paying Mother $250 per week in child support, had been providing medical coverage and other necessities for E.J.M., and had shared her physical care and custody. Father requested joint custody of E.J.M. or, alternatively, three days a week visitation. On April 17, 1996, the order of legitimation was modified to include an award of $325 per month child support. The order did not address custody or visitation.

On May 10, 1996, Father filed another petition in Juvenile Court seeking visitation with E.J.M. The Juvenile Court Referee conducted a hearing on the petition. On July 25, 1996, the Juvenile Court Referee entered a recommendation that Father be awarded visitation every other weekend from Friday after school until Sunday evening at 6:00 p.m. On the same day, the Juvenile Court Judge confirmed the findings and recommendations of the Referee. On August 14, 1996, Mother filed a petition to modify this order, claiming that she had no notice of the hearing. Mother also sought an increase in child support. On September 27, 1996, Father filed a petition for contempt, asserting that Mother refused to allow visitation in compliance with the July 25, 1996 order. On October 16, 1996, the Juvenile Court dismissed Father's petition for contempt. Child support was increased to $716 per month, and Father was awarded visitation every other weekend from Friday at 5:00 p.m until Sunday at 5:00 p.m., as well as every Wednesday from 5:00 p.m. until Thursday morning during the weeks he did not have weekend parenting time.

After the 1996 flurry of litigation, there was a lull of over two years. Then, on February 25, 1999, Mother filed a petition for an increase in child support, alleging that Father had substantially increased his income by opening two additional offices. Mother argued that an increase in child support was also appropriate because Father did not regularly exercise his visitation. On May 13,

---

[1]The facts relating to child support are included as background information only, because child support matters are not at issue in this appeal.

1999, Father filed a response, admitting an increase in income but denying that he failed to exercise regular visitation with E.J.M. Father contended that Mother restricted his visitation with E.J.M. contrary to the previous order of the Juvenile Court. On June 14, 1999, the Juvenile Court increased Father's monthly child support obligation to $1,651, from which $211 per month was to be placed in a trust fund to be established by Father for E.J.M.'s education.

On July 21, 1999, Father filed a petition in the Juvenile Court for additional visitation with E.J.M. On September 30, 1999, the Juvenile Court granted Father's petition, awarding him visitation on the first, third, and fifth weekends of each month, four weeks in the summer, and for certain times during the Thanksgiving and Christmas holidays. There was no further litigation for another two years.

On September 5, 2001, Mother filed another petition for an increase in child support. Mother alleged that Father increased his income by opening another dental office. In addition, Mother sought to have Father held in contempt for failing to open an educational trust account for E.J.M., as required by the June 1999 order.

On September 24, 2001, Father filed a petition for contempt against Mother, claiming that she willfully failed to comply with the Juvenile Court's September 30, 1999 order allowing Father additional visitation. The record indicates that a hearing was scheduled for October 18, 2001. However, Mother did not appear for the hearing. Consequently, at the October 18, 2001 hearing, the Juvenile Court entered an order awarding Father temporary custody of E.J.M. On October 23, 2001, that order was set aside, apparently based on Mother's representation that she did not receive notice of the October 18 hearing.[2]

After negotiations, on January 29, 2002, the parties reached an agreement, and the Juvenile Court incorporated the parties' agreement into a comprehensive consent order regarding E.J.M. The consent order provided that Mother would remain the primary residential parent. However, it also provided that Father would have increased residential parenting time consisting of: every other weekend from Friday after school until Tuesday morning; every other Thursday evening after school until Friday morning on the weeks that Father did not have weekend parenting time; and extended holiday and vacation parenting time. The order also gave Father decision-making authority in certain areas, and provided that the parties would "consult with one another on all major decisions affecting [E.J.M.'s] health, education, extracurricular activities, and general welfare." The order made no provisions regarding final resolution of such issues in the event of a dispute; however, the parties agreed to participate in counseling sessions with Mike Gooch at the Exchange Club of Greater Memphis.

---

[2]Father asserts that the order was set aside based on Mother's *ex parte* appearance before the Juvenile Court, claiming that she did not receive notice of the October 18, 2001 hearing. The order setting aside the change in custody, however, did not provide a reason for the decision.

The agreement did not last long. On February 18, 2002, about three weeks after the consent order was entered, Father filed an emergency petition to hold Mother in criminal contempt and to modify the consent order. Father alleged that Mother refused to allow him to exercise overnight parenting time on February 7, 2002, the first Thursday he was entitled to do so under the agreement. Father also contended that Mother indicated to him that she no longer agreed for Father to have parenting time on the Thursday evenings when he did not have weekend residential parenting time. Father also alleged that Mother refused to participate in counseling with Mike Gooch. In addition, Father asserted that on February 11, 2002, Mother physically assaulted him and destroyed a school project of E.J.M. in her presence and in the presence of E.J.M.'s schoolmates. Father argued that all of these facts constituted a material change in circumstances sufficient to warrant a change in designating him as primary residential parent.

In response to Father's petition, on March 11, 2002, the Juvenile Court appointed a Guardian Ad Litem, Andrea Lazarini, to represent E.J.M. With intervention by the Guardian, the parties reached another agreement. On April 22, 2002, the Juvenile Court incorporated this second agreement into another comprehensive consent order. The April 2002 consent order modified the prior arrangement by providing that Father would have parenting time every other week from Wednesday after school until Monday morning. Holiday, summer, and other vacations were to remain as set forth in the January 29, 2002 consent order. In addition, the parties agreed that, along with E.J.M., they would participate in counseling with psychologist Dr. Peter Zinkus ("Dr. Zinkus"), and that the parties would defer to Dr. Zinkus concerning the scope and duration of counseling. Further, the parties agreed to consult with one another on all major decisions regarding the E.J.M.'s "health, education, extracurricular activities, and general welfare." The April 1, 2002 order provided that Dr. Zinkus would be the final arbiter on any dispute regarding such issues.

The parties discussed with Dr. Zinkus ongoing concerns about E.J.M.'s performance in school. E.J.M. had attended first grade in 2000 at St. Augustine, a private school. She began first grade early, before she reached the appropriate age to do so, because Mother altered E.J.M.'s birth certificate so she would be admitted. Father was aware of Mother's action and did not agree but did not petition the Juvenile Court to intervene. The next year, Mother placed E.J.M. in second grade at Hanley Elementary School ("Hanley"), a public school near Mother's home (at that time) in Memphis. At some point, Mother moved to Southaven, Mississippi. In second grade at Hanley, E.J.M. struggled with her schoolwork. Over the summer of 2002, the parties discussed with Dr. Zinkus having E.J.M. tested for attention deficit disorder ("ADD"), whether E.J.M. should be moved to a private school, and whether she should repeat second grade. Mother felt that E.J.M. should attend a private school and should repeat second grade, but indicated that she could not fund private school tuition. Dr. Zinkus also felt that private school would be in E.J.M.'s best interest, and was likewise concerned that she was enrolled in a grade that was beyond her maturity level. However, Dr. Zinkus believed that the determination of E.J.M.'s grade level should be governed in part by the school E.J.M. would attend. Father did not disagree that a private school would be in E.J.M.'s best interest, but did not agree that she should be held back a grade, and would not agree to fund private school tuition for her. Despite several meetings, the parties were unable to agree on these issues.

-4-

Thus, by default, Dr. Zinkus concluded that E.J.M. should remain at Hanley Elementary for the 2002-2003 school year, and progress to the third grade.

E.J.M. began the 2002 school year in the third grade at Hanley Elementary. During the first week of school, her third-grade teacher, Patricia Harris, contacted the parties and met with them. Harris expressed concern about E.J.M.'s lack of focus and concentration, her lack of participation, and her handwriting skills. Now even more concerned, Mother contacted Sacred Heart Catholic School ("Sacred Heart") in Walls, Mississippi, and had E.J.M. tested to determine her appropriate grade level at that school. The test indicated that E.J.M. should repeat second grade. Thereafter, Mother told Father the results of the test and told him that she believed that E.J.M. should move to Sacred Heart and repeat second grade there. Father disagreed, and refused to pay tuition at Sacred Heart. Thereafter, Mother decided that she would somehow find the money for the tuition. She enrolled E.J.M. in the second grade at Sacred Heart at her own cost, against Father's wishes and, apparently, without the knowledge of Dr. Zinkus.

Shortly thereafter, on August 28, 2002, Father filed a petition in Juvenile Court seeking injunctive relief, to require Mother to adhere to Dr. Zinkus' decision regarding E.J.M.'s education. In the petition, Father averred that Mother had violated the consent order by unilaterally removing E.J.M. from Hanley Elementary and enrolling her in second grade at another school in direct contravention of Dr. Zinkus' decision. The next day, the Juvenile Court entered an order continuing the case until September 4, 2002. The order provided that, pending the September 4 hearing, E.J.M. was not to be removed from the third grade at Hanley Elementary without permission from the Court.

The following day, on August 30, 2002, Father filed an emergency petition in Juvenile Court to hold Mother in contempt and to modify E.J.M.'s primary residential status. Father alleged that, despite the clear mandate of the Juvenile Court the previous day, Mother refused to have the child attend Hanley Elementary on August 30, 2002. Father asserted that Mother's repeated disregard of the Juvenile Court's orders constituted a material change in circumstances such that the Court should designate Father as the primary residential parent.

On September 4, 2002, Honorable Cary C. Woods, sitting as Special Judge of Juvenile Court, entered an order again continuing the matter, but also granting Father temporary custody of E.J.M. and giving Mother visitation every other weekend. There is no transcript of this hearing, and the September 4 order does not state the reason for awarding Father temporary custody. However, a later order issued by the same judge and later testimony by the Guardian Ad Litem, Lazarini, indicate that the reason for changing custody of E.J.M. was two-fold. The later order entered by the same Juvenile Court Judge states that temporary custody was given to Father "based on the fact that Mother had denied visitation to Father and disobeyed the orders of this Court." Subsequent testimony by the Guardian Ad Litem indicated that Mother informed the Juvenile Court that she could not get E.J.M. to school on August 30, 2002 because she had recently undergone surgery. The Guardian Ad Litem testified that, in light of this, the Juvenile Court determined that if Mother could not get E.J.M. to school based on her physical condition, she should not continue to have custody. In any event, the

September 2002 order required that E.J.M. remain at Hanley Elementary, and that Father be given temporary custody of E.J.M. pending further orders of the Court.

Father moved E.J.M. back to the third grade at Hanley. Father engaged the services of Sylvan Learning Center to assist E.J.M. in her schoolwork. Meanwhile, a hearing in Juvenile Court was scheduled for October 3, 2002.

Prior to the October 3 hearing, the Guardian Ad Litem, Lazarini, submitted a pretrial memorandum summarizing her observations and recommendations. Lazarini noted the entry of the prior consent order, providing that Dr. Zinkus would be the final arbiter on issues regarding E.J.M. on which the parties could not agree. Lazarini recounted the parties' meetings with Dr. Zinkus on the issue of the best school and grade placement for E.J.M. She stated:

> It is undisputed that Mother and Father were both working with Dr. Zinkus toward enrolling [E.J.M.] in a private school and all parties involved believed that this would be in [E.J.M.'s] best interest. Unfortunately, when the parties failed to come to an agreement on a school or upon payment of tuition [by] the end of the summer, there was no choice but for [E.J.M.] to remain at Hanley Elementary.

> While this Guardian does not believe that Mother had vindictive motives when she unilaterally enrolled [E.J.M.] in Sacred Heart, she was clearly in violation of the Court's Order of April 22, 2002 which required agreement of the parties or a "decision" by Dr. Zinkus.

Although Mother believed it was in E.J.M.'s best interest to go to a private school, Lazarini noted, she failed to follow the steps in the consent order. The effect of Mother's actions, Lazarini determined, "was that [E.J.M.] suffered the consequence of being pulled back and forth when what she really needs is continuity." Lazarini stated that the parties' lack of communication skills had a negative impact on E.J.M. She noted that E.J.M. was progressing in school at Hanley Elementary, and concluded that E.J.M. should continue going to school there while being tutored at Sylvan Learning Center. She felt that E.J.M. was doing well in Father's care. For those reasons, Lazarini recommended that Father be designated the primary residential parent. Lazarini also recommended continued counseling with Dr. Zinkus.

The hearing was apparently held on October 3, 2002, as scheduled. The record includes no transcript of the hearing. At the conclusion, the Juvenile Court Judge took the case under advisement and requested that each party submit a memorandum of law concerning his or her respective position.

On November 5, 2002, while the case was still under advisement, Father filed another petition for contempt. He contended that Mother had again interfered with his parenting time, and that Mother had canceled two appointments with Dr. Zinkus. Father again argued that Mother's disregard of the Juvenile Court's orders constituted a change in circumstance such that Father should be designated as the permanent primary residential parent.

On March 12, 2003, a consent order was entered substituting Melanie Taylor as counsel for Mother. On March 20, 2003, after Guardian Ad Litem Lazarini retired, a consent order was entered substituting Linda Holmes as Guardian Ad Litem for E.J.M.

On April 7, 2003, Mother filed a petition to change the award of temporary custody from Father back to her. In her petition, Mother asserted that E.J.M. spent much of Father's residential parenting time with Father's wife or his mother, who had recently become ill, that Father refused to communicate with Mother via e-mail, and refused to permit Mother to participate in E.J.M.'s tutoring, and that the child's best interest would be served by returning custody to Mother. All matters were set for a hearing on June 10, 2003.

Prior to the June hearing, the substitute Guardian Ad Litem, Linda Holmes, submitted a report to the Juvenile Court. In her report, Holmes recited the factors enumerated in Tennessee Code Annotated § 36-6-106 in arriving at her recommendation.[3] She noted that both parents love and have

---

[3]Tennessee Code Annotated § 36-6-106(a) provides that, in making custody determinations, the court shall consider the following factors, where applicable:

(1) The love, affection and emotional ties existing between the parents and child;

(2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; . . .

(4) The stability of the family unit of the parents;

(5) The mental and physical health of the parents;

(6) The home, school and community record of the child;

(7) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; . . .

(9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child; and

(10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

(continued...)

emotional ties with E.J.M. She observed that while both parents can provide for E.J.M., Father had substantially more income than Mother, and that Father hired a private tutor for E.J.M. She acknowledged that E.J.M. had resided with Mother from birth until the Juvenile Court gave temporary custody to Father on September 4, 2002. Holmes stated that E.J.M. had "good grades" at Hanley Elementary School, and that her grades were improving with tutoring. She found that E.J.M. had a good relationship with her younger half-sister, her stepmother and the paternal grandmother. She further felt that both the stepmother and grandmother seemed concerned and caring about E.J.M. Holmes found it "disturbing" that Mother had altered E.J.M.'s birth certificate in order to enroll her in school a year early. She further noted that, despite her suggestion that the parties communicate only by e-mail, Mother continued to make numerous telephone calls to Father at his office. Holmes encouraged Mother to contact Dr. Zinkus to set up an appointment, noting that Mother had not seen Dr. Zinkus for some time. Holmes concluded that Father had "demonstrated consistency and stability in providing for [E.J.M.] and should remain the primary residential parent." She recommended that Father be designated as the primary residential parent and that Mother exercise parenting time four days every other week along with summer and holiday visits.

A hearing was held before Juvenile Court Referee Cary Woods on June 10, 2003. Judge Woods heard argument regarding only the matter taken under advisement in October 2002, Father's petition for injunctive relief to require Mother to send E.J.M. to Hanley, as decided by Dr. Zinkus, and the grant of temporary custody to Father. There is no resulting transcript of that hearing in the record on appeal. Judge Woods entered findings and recommendations, first in an order dated June 10, 2003, and then another substantially identical order dated June 23, 2003.[4] Judge Woods explained that custody can be changed based on the custodial parent's interference with the other parent's visitation rights only "when interference with visitation is coupled with a contrary and obstreperous attitude of the primary custodial parent." He determined that "no such change of circumstance exists at this time to constitute a substantial and material change of circumstances." Therefore, Judge Woods recommended that the Juvenile Court restore Mother as primary residential parent effective June 20, 2003. The recommendations set out detailed substantial parenting time for Father, consisting primarily of the first, third, and fifth weekends of each month from Thursday after school to Monday morning, with one night during the weeks in which he did not have weekend parenting time, and significant summer and holiday parenting time. The findings and recommendations also provided that the parties "shall continue to participate in joint counseling with Dr. Peter Zinkus to resolve their communication issues," and that they "shall communicate with each other via e-mail and maintain copies of their correspondence" until otherwise advised by Dr. Zinkus. The findings omitted the provision of the April 2002 consent order that Dr. Zinkus be the final arbiter of disputes between Mother and Father regarding E.J.M. Judge Woods' findings and recommendations were approved

---

[3](...continued)
Tenn. Code Ann. § 36-6-106 (2001).

[4]It is unclear why there are two orders with identical language entered by the Juvenile Court two weeks apart, one on June 10, 2003, and one on June 23, 2003. The entry date of the order, however, is not relevant to any of the issues on appeal.

by the Juvenile Court Judge. On June 30, 2003, Father filed a request for a hearing before the Juvenile Court Judge.

On August 14, 2003, while his request for a hearing was pending, Father filed a petition for injunctive relief. Citing the April 2002 consent order, Father asserted that, for the second straight school year, Mother refused to communicate with Father, Dr. Zinkus, or the Guardian Ad Litem concerning the school in which E.J.M. would be enrolled for the 2003-2004 school year. Father requested that Mother be enjoined from removing E.J.M. from Hanley Elementary. In Mother's response to Father's petition, she maintained that she was no longer bound by the mandate of the April 2002 consent order, because it was replaced by the June 23, 2003 order by Judge Woods. She contended that, as the primary residential parent, determining which school the minor child should attend in the 2003-2004 school year was her decision. Consequently, she asked that Father's petition for injunctive relief be denied.

Judge Woods conducted a hearing on Father's petition, but there is no transcript of the hearing in the record. At the conclusion of the hearing, Judge Woods entered findings and a recommendation to deny Father's petition for injunctive relief. The Juvenile Court Judge approved the recommendation on the same day.

On August 15, 2003, Father filed a second request for rehearing before the Juvenile Court Judge, this time concerning the denial of his August 14, 2003 petition. This request was combined with his June 30, 2003 request for a hearing, and both petitions were set for hearing on September 18, 2003.

On September 18, 23, and 25, 2003, Juvenile Court Judge Herbert Lane conducted hearings. Both parties, both Guardians Ad Litem, and several other witnesses testified regarding the course of events leading up to the hearing and about the relative fitness of the parties. E.J.M.'s original Guardian Ad Litem, Lazarini, testified first. At the outset, she stated that she was appointed after Father alleged that Mother failed to abide by the January 2002 consent order, and that her role did not involve determining the relative fitness of the parties. She said that she worked with the parties to prepare the April 2002 consent order requiring the parties to allow Dr. Zinkus to be the final arbiter on decisions involving E.J.M. Lazarini opined that Mother's failure to contact Dr. Zinkus regarding the change in schools for E.J.M. violated the April 2002 order designating Dr. Zinkus as the final decision-maker and the August 29, 2002 order, requiring that E.J.M. be re-enrolled at Hanley Elementary. When asked if Mother's disobedience served as the basis for the change of custody to Father, Lazarini said that it was her impression that the Juvenile Court Referee actually granted Father temporary custody because Mother had recently undergone surgery. According to Lazarini, the Juvenile Court Referee stated at the hearing, "if you're having problems and you can't get around, then the father should have custody." Lazarini observed that the parties could not communicate, and noted that the terms of the April 2002 order were put in place to protect E.J.M. Consequently, because Mother failed to follow the order, Lazarini said that she recommended that custody should be given to Father. Lazarini felt that E.J.M. was doing "extremely well" in third grade at Hanley Elementary in the 2002-2003 school year, and commented that E.J.M. was also enrolled in Sylvan

Learning Center for additional tutoring. She acknowledged, however, that she had not seen E.J.M.'s grades from the third grade at Hanley Elementary, nor had she seen the results of any test suggesting that E.J.M. had ADD or that she needed to remain in second grade. Lazarini stated that Dr. Zinkus had concerns that E.J.M. might be enrolled in a grade beyond her maturity level, but felt that the decision depended on the school in which she was enrolled. Lazarini thought that E.J.M. should have remained in the third grade at Hanley for the 2002-2003 school year, but stated that it was not her place to decide the grade in which the child should be placed.

Father called to testify the private tutor he hired for E.J.M. during the 2002-2003 school year, Tressa Lambert ("Lambert"). Lambert testified that, because of E.J.M.'s academic difficulties, she was hired by Father to tutor E.J.M. Monday through Thursday from 3:15 p.m. until 7:30 p.m. Lambert said that she "pushed [E.J.M.] and got her up to par, and had her making some great grades." Lambert said that she had no involvement with Mother, and had only met her once or twice. Lambert was of the opinion that E.J.M. had progressed well enough in third grade to proceed to the fourth grade. She was disappointed when E.J.M. was put back in third grade, because E.J.M. had worked very hard and did not want to be held back. Lambert recounted that E.J.M. had since made comments such as "I'm a dummy" and other similar negative comments because E.J.M. felt that she had failed third grade. Lambert believed that E.J.M. did not need remedial courses, that she just needed "someone behind her to push her." On cross-examination, Lambert was asked about the fact that E.J.M. had a C average on her third grade report card, and whether these were "great grades." Lambert responded that "she worked for those C's, and a C is not a bad grade."

Father called Ruby Payne ("Payne"), the principal of Hanley Elementary, the public school E.J.M. attended for second and third grade. Payne testified that from the second to the third grade, E.J.M. had improved in school. She said that E.J.M. did "very well" in school. Payne stated that she believed that E.J.M. was capable of moving to the fourth grade, and that she would not have taken E.J.M. from the fourth grade and placed her in a third grade class.

Payne also testified that Father was an "adopter" of Hanley Elementary. She explained that Hanley Elementary had at least sixteen such adopters, strong African-American role models in the community. Father was approached by the school and agreed to share his expertise as a dentist and a professional, to work with the children, and to give financial contributions to the school.

Patricia Harris ("Harris"), E.J.M.'s third grade teacher at Hanley Elementary, testified as well. Harris thought that E.J.M. was overall a good student and did not need to repeat the third grade. She said that E.J.M. seemed less mature at the beginning of third grade, but that by second semester she had become more mature.

Carolyn Crawford ("Crawford"), an assistant principal at Hanley Elementary, testified about an altercation between Mother and Father in E.J.M.'s presence at school. She said that she saw Mother following Father and E.J.M. into school, and that Father was carrying a large poster-like project. Crawford said that Mother caught up with Father and asked what was in his hand. Father would not show Mother what he was holding and walked away hastily, telling Mother to leave him

alone. When he refused to show the project to Mother, Mother snatched the project from his hand, looked it over, and stated that "You always do it. We did this project already. . . . You just want to make me look bad." Crawford heard Father tell Mother to move out of the way, and Mother then tore up the project and threw it in the garbage can. All of this occurred, Crawford said, in the presence of E.J.M. and others. She said that E.J.M. was visibly shaken. Father then asked Crawford to go with them to Payne's office about the incident. Payne assured Mother and Father that both of E.J.M.'s projects would be accepted, and that having two projects would help her get a better grade.

Cynthia Brown ("Brown"), the guidance counselor at Hanley Elementary, testified that E.J.M. had been doing well at Hanley and was more outgoing in the third grade than she was in the second grade. She opined that taking E.J.M. from Hanley Elementary, which was predominantly black, and putting in her in all-white school would possibly be detrimental to her and that it would be difficult for her to adjust to such an environment. Brown also said that putting E.J.M. back into third grade, after having passed third grade at Hanley Elementary, would have a negative psychological impact on her.

Carol Myers ("Grandmother"), Father's mother, also testified. She stated that, when E.J.M. was in Father's custody, Father took E.J.M. to school and she picked her up from school on days when the tutor did not. She stated that E.J.M. had become more outgoing than she had been in the past. She said that E.J.M. did not want to go to Sacred Heart and did not want to be put back in the third grade, that no one at Sacred Heart talked to her, and that she did not have any friends. Grandmother indicated that she was available to help Father take care of E.J.M. She said that Father worked every day from 9:00 a.m. until as late as 8:00 p.m., in addition to Saturdays sometimes from 9:00 a.m. until 3:00 p.m. or 4:00 p.m. Grandmother stated that she or Father's wife, Iris Myers ("Mrs. Myers"), would care for E.J.M. while Father was at work. She acknowledged that Mother is a good parent.

Father's wife, Mrs. Myers, also testified on Father's behalf. Mrs. Myers said that she is a teacher at Crump Elementary. She stated that her nine-year-old son from a previous marriage and the four-year-old daughter she has with Father both live in her home with Father. Mrs. Myers testified that E.J.M. loves her siblings and that the children "do just about everything together." Mrs. Myers' son and E.J.M.'s half-sister attend a private school. Mrs. Myers said that she was primarily responsible for the children until Father got home around 6:00 p.m. or 6:30 p.m. She stated that she had an amicable relationship with Mother.

Father testified on his own behalf. He testified that Mother falsified E.J.M.'s birth certificate to reflect that she was born in 1993, rather than 1994. On that basis, he said, Mother enrolled E.J.M. in the first grade at St. Augustine private school a year early. He then noted that Mother moved E.J.M. to Hanley Elementary in the second grade. In the following year, the 2002-2003 school year, three weeks into the third grade at Hanley Elementary, Mother took E.J.M. out of Hanley without informing Father of the change. At that point, in August 2002, the litigation over the Mother's disobedience of the April 2002 order ensued. Father was awarded temporary custody, and he placed E.J.M. back into the third grade at Hanley. Father said that he initially sought tutoring for E.J.M. at

the Sylvan Learning Center, and later hired a private tutor to help E.J.M. with her studies while she was at his home. After Mother was restored as primary residential parent in the Juvenile Court Referee's June 2003 order, Father was uncertain about whether he had retained any input in decision-making involving E.J.M., but he was of the opinion that Mother was still required to consult with him and Dr. Zinkus about the school E.J.M. attended for the 2003-2004 school year.

Father complained that, when he had temporary custody of E.J.M., Mother would often not timely return the child at the end of her visitation period. Father said that the anger between the parties went both ways. Father indicated that the animosity between he and Mother got worse when he got married three years prior. He stated that, after he got married, he became more interested in visiting with E.J.M. Though the relationship between Mother and Father worsened after Father's marriage, Father characterized the relationship between Mother and Mrs. Myers as "cordial" with no open hostilities. Father said that E.J.M. told him that she did not want to be put back in third grade, and that she had rejected the new school and reverted back into her shell. Father said that E.J.M. needs consistency and stability and that he is the better parent to provide those things. Father expressed his interest that E.J.M. do well in school, and commented that Mother's forging of E.J.M.'s birth certificate had resulted in E.J.M.'s problems in school. Father said that he knew about the forgery at the time, but indicated that it was Mother's decision and that he had no choice but to accept it.

Father testified that he has a third child, Lee, Jr., seven years old at the time of the hearing, who also attended private school. Lee, Jr., lived with his mother, with whom Father had an amicable relationship.

Father testified about a dispute that arose after Mother enrolled E.J.M. in soccer. Initially, he did not want E.J.M. to participate, but allowed it after consulting with the Guardian Ad Litem. When asked by Judge Lane if he would change schools if designated primary residential parent for E.J.M., Father said that he would ask for an opportunity to work with E.J.M. in the fourth grade. Father did not indicate that he would necessarily remove E.J.M. from Sacred Heart. He acknowledged that Dr. Zinkus thought it best for E.J.M. to attend third grade at Sacred Heart, but said that Dr. Zinkus thought she should have begun the year in third grade rather than be put in fourth grade initially and then put back. Father stated that he wanted the opportunity to be primary residential parent for E.J.M. so that he could pull E.J.M. out of her shell and work with her to make better grades.

Mother testified on her own behalf. She noted that E.J.M. had lived with her until Father was awarded temporary custody in September 2002. She said that, prior to the award of temporary custody, Father had had little involvement in E.J.M.'s life. Mother claimed that on most of Father's visits with E.J.M., Grandmother would pick her up and bring her back home. Mother asserted that, prior to his 1996 petition for visitation, Father did not often exercise visitation. Despite Father's protestations to the contrary, Mother said, her requests for increased child support were met with hostile comments such as, "I will take [E.J.M.] from you before I give you anymore money." Mother indicated that Father enrolled E.J.M. in dance lessons at a time that conflicted with her schedule, and that she enrolled E.J.M. in soccer against Father's wishes. At that point, the Judge Lane commented

-12-

that Mother had obviously enrolled the child in soccer as a way to retaliate against Father. Judge Lane said, "[T]hese two have been using the child as a way to get even with one another. . . . [W]hat's it going to take to get it to stop?"

Mother claimed that she had let go of her animosity towards Father and that she wanted to work with Father in the best interest of E.J.M. She acknowledged that, when E.J.M. was younger, Mother had unresolved issues that she had to work through. She noted that Father had also exhibited animosity toward her. Regarding visitation, Mother stated that both parties had been guilty of not strictly adhering to visitation schedules.

Mother testified about the school project that she destroyed in E.J.M.'s presence. Mother said that she and E.J.M. had worked on the same school project all weekend and had turned it in. When she took E.J.M. to school on the day of the incident in question, Mother saw Father with a project in his hand. Father refused to let Mother see the project. When Mother asked Father about it, he said it was E.J.M.'s project. When Mother told Father that she and E.J.M. had stayed up all night long doing a project of their own, Father said that E.J.M. would just have to turn in two projects. It was Mother's opinion that Father was trying to make her look bad, and Mother became angry. She admitted that she "snatched" the project from Father and threw it away because she was hurt. Mother said that she should not have done it, noted that the incident occurred almost two years prior to the hearing, and said that she had not exhibited that type of behavior toward Father or any of his family members since that time.

Mother also testified about the school placement issues. She acknowledged that Father initially did not want E.J.M. to go to Hanley Elementary in second grade, but that Mother enrolled her anyway. Mother stated that, after E.J.M. had completed second grade at Hanley Elementary, she and Father talked with Dr. Zinkus, who thought E.J.M. should repeat the second grade in a harder school. Mother could not afford to pay for private school, and Father refused to pay for private school. Mother said she told Father that the money being spent on tutoring could be put toward private school tuition, but Father refused. Consequently, by default, E.J.M. was put in third grade at Hanley Elementary. When E.J.M.'s teacher at Hanley Elementary told the parties that E.J.M. was not progressing in third grade, Mother reconsidered putting E.J.M. in a private school. After making the decision to fund the private school tuition herself, Mother transferred E.J.M. to Sacred Heart, in second grade. Mother maintained that she moved E.J.M. because it was in E.J.M.'s best interest. She stated that, after the parties discussed the issue with Dr. Zinkus during the summer, and he felt E.J.M. should repeat the second grade in a harder school if the parties could agree on funding private school tuition, that the transfer to Sacred Heart was permitted in light of the fact that the only obstacle to a private school had been the money. When Mother decided to fund the tuition herself, that obstacle was removed. So, Mother explained, she believed at the time that her actions were consistent with the Juvenile Court's order. At the time of the hearing, Mother conceded that she had gone about it the wrong way by failing to get Dr. Zinkus' written approval.

Mother maintained that Judge Woods had given Father temporary custody of E.J.M. in part because she was recovering from surgery. However, she acknowledged that the order was entered

in part to "punish" her for not complying with the Juvenile Court's orders. She said she regretted it, that she had abided by the Court's orders since that time, and that she would continue to do so. Mother said that, when E.J.M. is in her home, she encourages E.J.M. to contact Father and makes E.J.M. available for phone calls from Father. Mother said that, when she called E.J.M. at Father's home, she did not get an answer, and the answering machine consistently said that it was full so she could not leave a message.

Mother testified about having E.J.M. tested at the beginning of the 2003-2004 school year, and transferring her to Sacred Heart private school. She said that E.J.M.'s skills were not sufficient to put her in the fourth grade. Mother stated that, in the test taken at St. Ann's School, E.J.M. tested below the third grade level. Mother considered putting E.J.M. at St. Ann's school because initially there was not a spot available at Sacred Heart. When a spot became available at Sacred Heart, Mother enrolled E.J.M. at that school.

Mother insisted that, since she was restored as primary residential parent in June 2003, she consulted with Dr. Zinkus before moving E.J.M. from Hanley Elementary to Sacred Heart. Mother asserted that the guidance counselor at Sacred Heart spoke to Dr. Zinkus as well. But she acknowledged that she did not talk with Father about transferring E.J.M. Mother claimed that she did what was in E.J.M.'s best interest after consulting with Dr. Zinkus and her attorney.

Since E.J.M. was transferred to Sacred Heart and put back into the third grade, Mother testified, she was progressing but still had difficulty, particularly in math. Mother said that she worked with E.J.M. reading nightly. Although she could not afford a private tutor for E.J.M., Mother said that she purchased "math builder" books and used them with E.J.M. to improve her math skills.

Several of Mother's friends testified at trial, stating that E.J.M. is Mother's number one priority. Her supervisor at work, Deborah Kelly, testified that Mother's hours at work were flexible and that she was allowed to bring E.J.M. into work when there was no one to pick her up. She described Mother as a nurturing, caring mother, and said that Mother and E.J.M. had a close mother/daughter relationship. Kelly also testified about Father's animosity towards Mother, noting an incident in which Father said to Mother, "one day I'll have the money to take this child from you." Dawn Smith, Mother's aunt, also testified that Mother and Father have severe communication problems. She testified that she would be available to Mother to help care for E.J.M.

The substitute Guardian Ad Litem, Holmes, testified on two different occasions during the hearings. Holmes testified that she did not agree with Judge Woods' decision to restore Mother as primary residential parent. While she conceded that Mother was a good parent, she felt that Father had been more consistently reliable. Holmes commented that she did not understand "what the change in circumstances was" to warrant changing custody from Father to Mother, and argued that for the Juvenile Court to change custody back to Mother, there had to be a "material substantial change of circumstances."

-14-

Holmes testified that, in early August 2003, after Judge Woods restored Mother as primary residential parent, Mother had E.J.M. undergo an educational assessment to determine appropriate grade placement at St. Ann's Catholic School in Bartlett, Tennessee. This was done because Mother was contemplating enrolling E.J.M. at St. Ann's. Shortly thereafter, apparently, Mother's counsel wrote a letter to Holmes and to Father's attorney informing them that Mother was considering enrolling E.J.M. at St. Ann's. At that time, Dr. Zinkus learned of the possible transfer from Hanley. Holmes was disturbed that she, as Guardian, did know which school E.J.M. would be attending. Holmes acknowledged that, in subsequent proceedings, Judge Woods clarified that the June 23, 2003 order was intended to supplant the April 2002 consent order designating Dr. Zinkus as the decision-maker in disputes between the parties, and that this provision was no longer applicable.

Holmes met with E.J.M. and learned that, not surprisingly, E.J.M. was disappointed at the prospect of being held back a grade, feeling that she had "already passed" third grade. Holmes was convinced that "demoting" E.J.M. would be "very detrimental" to her. Subsequently, vacancies in both the third and fourth grades opened up at Sacred Heart school, and Mother sought to transfer E.J.M. to Sacred Heart, utilizing the grade level assessment done by St. Ann's. Holmes contacted the guidance counselor at Sacred Heart to ask that E.J.M. not be subjected to any further testing, feeling that additional testing would be "harmful." Despite the fact that the initial tests at St. Ann's indicated E.J.M. was not ready to be in the fourth grade, and despite Dr. Zinkus' opinion that E.J.M. should be held back a grade, Holmes intervened at Sacred Heart and asked the principal and guidance counselor to place E.J.M. in the fourth grade. Based on Holmes' request, Sacred Heart agreed to begin E.J.M. in the fourth grade and observe her in the classroom, and to use this information along with the testing to determine E.J.M.'s grade placement. After observing E.J.M. in the fourth grade class for several weeks, Sacred Heart determined that she was not performing to grade level, and she was put back in the third grade.[5] Holmes testified that neither Father nor Grandmother believed E.J.M. should be in the third grade, and said that she had been told that E.J.M. had not made any friends at Sacred Heart. She acknowledged that she had received a letter from Sacred Heart indicating that E.J.M. had adjusted and had made friends, and that she should stay in the third grade. Nonetheless, in her argument to Judge Lane, Holmes, after criticizing Mother's alteration of E.J.M.'s birth certificate to start her in first grade prior to her reaching the appropriate age, remained distressed by E.J.M.'s disappointment at being held back and even indicated that she intended to intervene again to ask Sacred Heart to craft a third grade/fourth grade "split" for E.J.M.[6]

---

[5]During Father's testimony on E.J.M.'s distress at being put back a grade, Judge Lane noted that Dr. Zinkus believed that at Sacred Heart E.J.M. should be in the third grade, and observed that Dr. Zinkus "said there was a better way to do that. . . . [W]hen she starts school that year, don't put her up in the 4th grade and put her back. Leave her in the third grade."

[6]The first Guardian Ad Litem, Lazarini, testified, "I don't think it's my position as guardian to decide what grade the child should be in." It may be that the second Guardian, Holmes, was instructed by Judge Woods to make such decision, but this is not reflected in the appellate record.

-15-

At the conclusion of the hearing, the Juvenile Court Judge issued an oral ruling which reflected his weighing of the evidence. He noted that, at one point, Mother had taken some actions that interfered with Father's residential parenting time with E.J.M., and that Judge Woods had responded by placing E.J.M. temporarily with Father. He then observed:

> Thereafter, the only problem that we had related to the school. . . . As early as the 2nd grade they knew this child was having a problem, and the discussion was should we put the child back or put the child in a private school? . . . Was [Mother] motivated because she cared about which school the child went to? I think so. I think she knew the child was having problems. I think [Father] was aware the child was having problems, and each of them in their own way tried to deal with it. But should I tell her that she should lose custody because she's concerned about her child's education? I can't see it, folks. I just – I don't see, in this case, that this rises to the point that her interference with his visitation and these Court Order [sic] was such that I need to remove custody from her.

He said that the parties "simply can't talk to one another" and were "probably never going to be able to agree" on E.J.M.'s school issues, so the primary residential parent, Mother, would have to make those determinations, although Father would remain involved with the school and bring any problems to the court's attention. On the issue of whether E.J.M. had been placed in the appropriate grade, Judge Lane commented, "Well, obviously, I don't know. I mean, I'm not her teacher, so I wouldn't know that. All I can do is leave it up to the . . . people who know what kids need, and that would be the school." He warned Mother that, if she continued to interfere with Father's residential time, she would in fact lose custody of E.J.M., but added, "I do not feel that it has reached the point that I can do that at this stage." Therefore, he affirmed the ruling of Judge Woods. Consistent with its oral ruling the Juvenile Court entered an order confirming the Referee's rulings dated June 23, 2003, and August 14, 2003, restoring Mother as primary residential parent. From that order, Father now appeals.

On appeal, Father argues that the Juvenile Court erred in designating Mother as the primary residential parent and by divesting Father of the decision-making authority he had been given in the prior April 2002 consent order. Father argues that no material change in circumstances occurred after the Juvenile Court granted him custody on September 4, 2002, warranting a change of custody to Mother. Alternatively, if Father had the burden of showing a material change of circumstances since the entry of the April 2002 consent order designating Mother as primary residential parent, Father argues that he has met this burden. In addition, Father argues that, if the appellate court finds that the Juvenile Court was correct in determining that Mother should remain the primary residential parent, then the Juvenile Court erred in failing to give him any decision-making authority as was agreed upon in the April 2002 consent order.

We review the Juvenile Court's findings of fact *de novo* on the record, presuming those findings to be correct unless the evidence preponderates otherwise. *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002); *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984); Tenn. R. App.

-16-

P. 13(d). We review issues of law *de novo*, with no such presumption of correctness. ***Kendrick***, 90 S.W.3d at 569-70; Tenn. R. App. P. 13(d). In cases regarding custody, the Juvenile Court has broad discretion because such "decisions are factually driven and require the careful consideration of numerous factors." ***Morris v. Morris***, No. M2001-02275-COA-R3-CV, 2002 WL 31059222, at *2 (Tenn. Ct. App. Sept. 17, 2002) (quoting ***Bah v. Bah***, 668 S.W.2d 663, 666 (Tenn. Ct. App.1983)). The trial judge is in a position to observe the demeanor of the witnesses and to make determinations of credibility. ***Id.*** Therefore, the Juvenile Court's custody determination will be reversed only if it has abused its discretion. ***Id.***

Custody orders are *res judicata* and cannot be modified unless there has been a material change in circumstances that makes a change of custody in the child's best interest. ***Kendrick***, 90 S.W.3d at 570; ***Blair v. Badenhope***, 77 S.W.3d 137, 148 (Tenn. 2002); ***see also Woodard v. Woodard***, 783 S.W.2d 188 (Tenn. Ct. App. 1989). The "threshold issue" is whether a material change in circumstances occurred after the initial custody determination. ***Blair***, 77 S.W.3d at 150. The Supreme Court has explained that "[t]here are no hard and fast rules" in making such a determination:

> While "[t]here are no hard and fast rules for determining when a child's circumstances have changed sufficiently to warrant a change of his or her custody," the following factors have formed a sound basis for determining whether a material change in circumstances has occurred: the change "has occurred after the entry of the order sought to be modified," the change "is not one that was known or reasonably anticipated when the order was entered," and the change "is one that affects the child's well-being in a meaningful way." We note that a parent's change in circumstances may be a material change in circumstances for purposes of modifying custody if such a change affects the child's well being.

***Kendrick***, 90 S.W.3d at 570 (citation omitted). Once it has been determined that a material change in circumstances has occurred, then the issue becomes whether a modification of custody is in the child's best interest, considering the factors enumerated in Tennessee Code Annotated § 36-6-101(a). ***Id.*** "The trial court must recognize a strong presumption in favor of continuity of placement." ***Morris***, 2002 WL 31059222, at *2 (quotation omitted).

The first issue we must address is whether Father had the burden of showing a change in circumstances to justify a change of custody from Mother to Father since the April 2002 consent order, or whether Mother had the burden of showing a change in circumstances since the September 4, 2002 order granting temporary custody to Father. Father contends that there is a split of authority on this issue.

In support of his assertion that Mother must show a change of circumstances from the grant of temporary custody to him, Father cites ***Dailey v. Dailey***, No. 03A01-9409-CH-00340, 1995 WL 11179 (Tenn. Ct. App. Jan. 12, 1995). In ***Dailey***, in the final divorce decree, the mother was awarded custody of the parties' child. Two years later, the father filed a petition to modify custody based on

-17-

changes in the mother's lifestyle. After a hearing, the trial court granted temporary custody of the child to the father. The trial court instructed the mother to "get [her]self straightened out" so that the court could later reconsider the custody arrangement. *Dailey*, 1995 WL 11179, at *1. Three months later, the mother filed a petition to change custody back to her, alleging that there had been a change in circumstances since the previous order giving temporary custody to the father. After a hearing, the trial court returned custody of the child back to the mother. The father appealed that order. On appeal, the mother argued that father had only temporary custody, and that she was not required to prove a change in circumstances in order to be awarded custody of the child. The appellate court disagreed, stating that "the term 'temporary' when used in the context of child custody is pure surplusage. All custody decisions are temporary in the sense that they remain under the control of the court and can be changed at any time upon a proper showing that a change has occurred in material circumstances . . . ." *Id.* at *3. Therefore, because the mother did not show a change in circumstances from the date of the order granting the father temporary custody, the appellate court reversed the grant of custody to the mother. *See also Anthony v. Rodgers*, No. W2002-01240-COA-R3-CV, 2003 WL 22213208, at *4 (Tenn. Ct. App. Sept. 23, 2003) (indicating that a temporary order of custody to the mother would have had a *res judicata* effect, but determining that it did not because of lack of notice to the father).

It is undisputed, however, that several other cases have held that "[a] temporary order of custody does not constitute a final order shifting the burden of proof to the custodial parent." *Warren v. Warren*, No. W1999-02108-COA-R3-CV, 2001 WL 277965, at *3 (Tenn. Ct. App. Mar. 12, 2001); *see also Spatafore v. Spatafore*, No. E2001-02459-COA-R3-CV, 2002 WL 31728879 (Tenn. Ct. App. Dec. 5, 2002); *Phillips v. Phillips*, No. W2001-01685-COA-R3-CV, 2002 WL 927514 (Tenn. Ct. App. May 2, 2002); *Placencia v. Placencia*, 3 S.W.3d 497 (Tenn. Ct. App. 1999); *Gorski v. Ragains*, No. 01A01-9710-GS-00597, 1999 WL 511451 (Tenn. Ct. App. July 21, 1999). In *Warren*, the parties divorced, and they agreed that the mother would be the primary residential parent of the parties' minor child. Several years later, the father was advised that the mother and her new husband intended to move with the child to Illinois. *Warren*, 2001 WL 277965, at *1. The father then filed a motion opposing the child's relocation to Illinois and requested a change of custody to him. The trial court granted temporary custody of the child to the father, but stated that the custody issue would be reevaluated in three months. After a full hearing on the matter, the trial court determined that the child should live with the mother in Illinois. *Id.* The father appealed that order. On appeal, the father argued that the trial court erred in failing to require the mother to show a material change in circumstances from the date of the order granting him temporary custody. The appellate court disagreed, explaining:

> The law makes a distinction between temporary and final orders of custody. "An interim order is one that adjudicates an issue preliminarily; while a final order fully and completely defines the parties' rights with regard to the issue, leaving nothing else for the trial court to do." Trial courts have discretion to grant temporary custody arrangements in circumstances "where the trial court does not have sufficient information to make a permanent custody decision or where the health, safety, or welfare of the child or children are imperiled."

*Id.* at *4 (citations omitted). Thus, the court held that the mother was not required to show a material change in circumstances from the date that the father was given temporary custody.

The holding in *Warren* is well-reasoned. Indeed, the reality is that temporary awards of custody often must be made quickly, without opportunity for full consideration of all of the circumstances. Therefore, despite the rather unfortunate language utilized in the *Dailey* decision, we must conclude that *Warren* correctly states the law in Tennessee. *See Spatafore*, 2002 WL 31728879, at *2 n.1 (noting that, although there had been temporary modifications in custody, "the decree which must be analyzed to see whether a material change in circumstances has occurred is the initial custody decree"); *Phillips*, 2002 WL 927514, at *2 (stating that "[o]nly the Final Order, which adopted the Permanent Parenting Plan, should be considered a final decree"); *Placencia*, 3 S.W.3d at 499-500 (placing the burden of showing a change in circumstances on the mother, the non-custodial parent, despite the fact that the court gave her temporary custody pending a final resolution of the custody issue); *Gorski*, 1999 WL 511451, at *4 (determining that the fact that the children had been in the father's temporary custody for several years did not shift the burden to the mother to show a change in circumstance). Our conclusion is consistent with the long-recognized principle that, when a decree of custody is entered, it is *res judicata*, and will not be modified absent a change in circumstances that justifies such a modification for the welfare of the child. *In re B.A.L.*, W2004-00826-COA-R3-CV, 2004 WL 3008810, at *4 (Tenn. Ct. App. Dec. 23, 2004). When a petition for modification is filed, any temporary decree changing custody pending final resolution is just that – temporary and not entitled to the same *res judicata* protections. We note that "[t]emporary alterations of existing custody arrangements should be limited to circumstances where clear and convincing evidence shows that a child is being harmed or is about to be harmed where he or she is," and, when a temporary change in custody is made, it should "amount to nothing more than a preliminary decision . . . until a reasonably prompt full hearing on custody can be held." *Goskins*, 1999 WL 511451, at *5. Thus, the Juvenile Court Judge did not err in holding that Father, not Mother, was required to prove a material change in circumstances since the order of custody being challenged here, the April 2002 consent order designating Mother as primary residential parent.

Father argues that he in fact proved that there has been a material change in circumstances since the April 2002 order, and that a modification in custody would be in E.J.M.'s best interest. He asserts that the record as a whole supports his contention that the only sense of stability or permanency in this child's life occurred during the period in which Father had temporary custody. Father notes that Mother continued to change schools for E.J.M. without first obtaining his consent, and contends that Mother repeatedly failed to abide by the Juvenile Court's orders; that she interfered with his relationship with E.J.M.; and that she created an unstable school environment for E.J.M. Father argues that all of these circumstances demonstrate a material change in circumstances justifying permanently designating him as E.J.M.'s primary residential parent.

In response, Mother argues that Father has not satisfied his burden of showing a material change in circumstances since the April 2002 order. Mother claims that her decision to remove E.J.M. from Hanley Elementary and enroll her at Sacred Heart was precipitated by the conference with Harris, E.J.M.'s third-grade teacher at Hanley, who expressed concern that E.J.M. continued to

struggle in school. She concedes that she did not first obtain Father's consent, but maintains that the change in schools was made because she believed it was in E.J.M.'s best interest. She further points out that the original Guardian Ad Litem, Lazarini, noted that Mother did not have vindictive motives in moving E.J.M. to a different school. With respect to Father's claim that Mother interfered with his relationship with E.J.M, Mother contends that the evidence showed that both parents failed to strictly abide by the terms of visitation, and claims that Father presented no evidence of a denial of parenting time that had not been adjudged in a previous order by the Juvenile Court. Indeed, she asserts that the evidence showed that she tried to encourage Father to have a relationship with E.J.M. Under these circumstances, she argues, there is no material change in circumstances that would warrant modifying the previous order and designating Father as primary residential parent.

The Juvenile Court in this case found that the circumstances presented did not "rise[] to the point that [Mother's] interference with [Father's] visitation and these Court Order[s]" warranted a change in custody from Mother to Father. In other words, any change in the parties' circumstances was not deemed sufficient to justify changing the existing custody arrangement. "There are no bright line rules for determining when a change of circumstances should be deemed material enough to warrant changing an existing custody arrangement." *Oliver v. Oliver*, M2002-02880-COA-R3-CV, 2004 WL 892536, at *3 (Tenn. Ct. App. Apr. 26, 2004). The resolution of this issue turns on the unique facts of each case. *Id.* The factors to be considered include (1) whether the change in circumstances have occurred after the entry of the order sought to be modified, (2) whether the change was not reasonably anticipated, and (3) whether the change affects the child's well-being in a meaningful way. *Kendrick*, 90 S.W.3d at 570. Giving appropriate deference to the trial court's determination of credibility, then, we must examine whether the evidence preponderates against the trial court's determination, or whether it abused its discretion in reaching its conclusion.

The focus must be on the change in circumstances since the April 2002 consent order, which designated Mother as the primary residential parent. Father's petition for contempt and to modify custody, filed August 30, 2002, was based on Father's claim that Mother had (1) violated the April 2002 order by removing E.J.M. from third grade at Hanley Elementary in contravention of the decision of Dr. Zinkus, and (2) failed to return the child to Hanley Elementary after the Juvenile Court had ordered that the child not be removed pending a hearing. Father asserted that Mother's "continued disregard of this Court, Father, and the child's best interest indicates a substantial and material change in circumstances . . . ."

Although Father retains the burden of proving a material change in circumstances since Mother was designated primary residential parent, we do not blind ourselves to the events that took place after Father was granted temporary custody. "[E]vents and lives have not stood still while this custody dispute has been in the courts." *Gorski*, 1999 WL 511451, at *4. During the approximately ten months in which Father had primary custody of E.J.M., he demonstrated himself to be a concerned and loving parent. In some cases, giving temporary custody to the non-custodial parent can "inevitably destabilize the equation for modifying permanent custody. Quite often, [it] will insidiously shift the momentum in the case to the temporary custodian," increasing that parent's chances of obtaining permanent custody. *Id.* at *6

To be considered as well is the fact that Mother was removed as primary residential parent in part as a result of Mother's disobedience of the Juvenile Court's orders regarding E.J.M.'s placement in school. It is well established that removing a child from a custodial parent is not available as a remedy to punish the custodial parent's willful disobedience of a court order. *Adams v. Cooper*, No. M1999-02664-COA-R3-CV, 2000 WL 225573, at \*7 (Tenn. Ct. App. Feb. 29, 2000); *Kyker v. Kyker*, No. 03A01-9509-CV-00324, 1996 WL 67178 (Tenn. Ct. App. Feb. 16, 1996). In *Adams*, the mother was given custody of the parties' minor children "so long as she obeys the orders of this Court with respect to visitation." *Adams*, 2000 WL 225573, at \*2. When the children missed a scheduled visitation, the trial court changed custody to the father. The appellate court found that changing custody for failure to abide by a court order was error, observing that a trial court may punish contemptuous conduct by fine, imprisonment, or both. "[A] custody decision is not, and cannot be, used to punish the parent. It is well established that an award of custody is to be made to assure the best interests of the children and not to reward or punish a parent." *Id.* (citing cases).

"However, a custodial parent's actions which interfere with the relationship between the child and non-custodial parent may constitute a material change in circumstances." *Roach v. Bourisaw*, No. M2000-02651-COA-R3-CV, 2001 WL 1191379, at \*6 (Tenn. Ct. App. Oct. 20, 2001). In *Roach*, the father sought a change of custody because the mother failed to comply with the ordered visitation and otherwise took actions to obstruct the father's relationship with the minor child. The trial court changed custody to the father, finding that the mother was unwilling to allow a relationship between the father and the child, and that she did not recognize the importance of a continuing relationship between the two. *Id.* at \*7. The appellate court upheld the decision, noting that maintaining a relationship with the non-custodial parent is important to the child's well-being. *Id.* at \*6. Thus, where a custodial parent's failure to abide by a visitation order is such that it is obstructive to the relationship between the child and the non-custodial parent, this can constitute a material change in circumstances sufficient to justify a change in custody. *Id.*

Here, it is undisputed that Mother's conduct violated the provisions in the Juvenile Court's orders. However, it is also undisputed that E.J.M. started school too early for her grade, an action for which Mother was roundly criticized and which she later regretted. It is undisputed that E.J.M. struggled in second grade at Hanley. During the course of the parties' meeting with Dr. Zinkus over the summer of 2002, it is undisputed that Dr. Zinkus was concerned that E.J.M. was enrolled in a grade that was beyond her maturity level, and that the primary impediment to enrolling E.J.M. in a private school was Father's payment of the tuition. It is likewise undisputed that, at the outset of E.J.M.'s third grade year at Hanley, her third grade teacher told the parties that E.J.M. was still having significant difficulties. Indeed, after Father was granted temporary custody, E.J.M. was required to work very hard, studying for four hours or more every day with a private tutor, after having spent a full day at school, in order to achieve modest grades. Moreover, after doing so, test results showed she performed below her grade level at St. Ann's and, after observation, at Sacred Heart as well. Against this backdrop, the Juvenile Court Judge evaluated Mother's motives and credibility, and concluded that her actions were motivated by concern for her child's education, and not by vindictiveness towards Father. Giving appropriate deference to the trial court's determinations of credibility, we find no error in this conclusion.

In light of this credibility determination, the trial court concluded that Mother's actions and her search for the appropriate education for E.J.M. were not shown to be harmful. To be sure, E.J.M. must have been affected by changing schools from one to another and back again during the school year. The evidence indicated, however, that this resulted in large part from the difficult and cumbersome process of attempting to resolve the differences between Mother and Father. Removing Mother as primary residential parent as punishment because she did not follow the procedure in the consent order, without a determination that her conduct adversely affected the well-being of the child, would be impermissible. *See Adams*, 2000 WL 225573, at *2. Under these circumstances, we cannot find that the evidence preponderates against the Juvenile Court's conclusion that Mother's disobedience of the Court's orders did not rise to the level of a material change in circumstances sufficient to warrant a change in custody.

Clearly the issue of the grade in which E.J.M. should be placed was a sincere point of dispute between Mother and Father about which reasonable persons could disagree. Indeed, Father submitted significant evidence substantiating his point of view, including the testimony of the educators at Hanley and the evidence of the understandable distress of a young girl at the prospect of being held back a grade. The Juvenile Court Judge wisely observed that it was not the Court's place to decide the grade in which E.J.M. should be placed. Rather, it was the Court's place to determine who should make that decision.

In his November 2002 petition for contempt, Father also argued that custody should be changed because of Mother's contemptuous conduct in failing to return E.J.M. on one occasion as scheduled on a Sunday afternoon, and because Mother failed to keep two appointments with Dr. Zinkus. Father now argues that all of Mother's transgressions, when taken as a whole, warranted a change in custody. Considering the evidence as a whole, we find that the Juvenile Court did not err in concluding that Mother's failure to return E.J.M. on one occasion and her failure to meet with Dr. Zinkus, when considered with the actions discussed above, did not constitute such conduct as to require a change in custody.

If the Juvenile Court had been charged with simply weighing the comparative fitness of these two good and devoted parents, designating Father as primary residential parent may very well have been warranted. However, for the sake of continuity, "the courts favor existing custody arrangements." *Oliver*, 2004 WL 892536, at *2. Mother had been E.J.M.'s primary residential parent for almost eight years, until the Juvenile Court granted temporary custody to Father in September 2002. The record shows that Mother was a fit parent who provided for E.J.M. throughout that time. Under all of these circumstances, we must conclude that the evidence overall does not preponderate against the Juvenile Court's finding that there had not been a material change in circumstances since the April 2002 order that would warrant a change in custody from Mother to Father.

Finally, Father argues that the trial court erred in modifying the prior consent order by divesting him of any final decision-making authority with respect to E.J.M. He argues that Mother did not demonstrate a change in circumstance sufficient to deprive Father of his agreed-upon decision making authority as provided for in the April 2002 consent order. In the June 2002 order restoring

Mother as primary residential parent, the Juvenile Court stated that the parties "shall continue to participate in joint counseling with Dr. Peter Zinkus to resolve their communication issues," but did not include a provision that Dr. Zinkus would be the final arbiter in the event of a dispute between the parties. At the hearing, both Father's counsel and Holmes advocated including such a provision in the final order.

This presents a particularly difficult issue where, as here, both parents are fit, concerned, and loving, but simply cannot work amicably with each other for the benefit of the child. The Juvenile Court Judge struggled with this issue, as evidenced by his interchange with both Father's counsel and Holmes:

> MS. HOLMES: I think the concern was should there be a consultation prior to a decision being made with Dr. Zinkus? . . .
>
> THE COURT: Dr. Zinkus wasn't able to help them through it last time. I mean, both of them had a different opinion about how this should be reached. Dr. Zinkus said, "Oh, I'm going to try to help you through it." He couldn't get them to agree either. . . . The only way that I know to resolve it is give the mother the authority to put the child in the appropriate school and go from there.
> * * *
> I want him involved with the child's education, but how am I going to accomplish that? I'm looking for a way out here.
>
> MR. MOSKOVITZ: My suggestion is to do exactly what they agreed to do with Dr. Zinkus, where I think they were making progress, and I think that –
>
> THE COURT: They weren't, were they? If they couldn't agree. . . I don't know who's at fault there. I'll say they're both equally a problem, but if they cannot agree with Dr. Zinkus, then what have we gained by saying you're going to have to go to him to choose the school?
> * * *
> [Dr. Zinkus] became so frustrated he said Hanley by default.

The evidence certainly supports the Juvenile Court's determination that the parties have been unable to compromise and work together. Their efforts at joint decision-making, with or without Dr. Zinkus, simply did not work. *See Garner v. Garner*, 773 S.W.2d 245 (Tenn. Ct. App. 1989) (stating that a joint custodial arrangement requires the utmost faith and selflessness on the part of both parents). Indeed, the evidence establishes that it was the constant power struggle between these parties that caused the most harm to E.J.M. Though Father undoubtedly wants only what is in the best interest of E.J.M., the Juvenile Court rightly concluded that the conflicts between he and Mother must stop. Divesting one party or the other of final decision-making authority becomes the only option, and it is in the best interest of E.J.M. at this juncture that the decision-maker be the primary residential parent, Mother. The parties are still required to consult with Dr. Zinkus to resolve their

communication problems.  If  Mother refuses to comply with the order to consult with Dr. Zinkus, the Juvenile Court can address the issue at that time in its discretion.

The decision of the trial court is affirmed.  Costs on appeal are to be taxed to Appellant Lee T. Myers, and his surety, for which execution may issue, if necessary.

_____

HOLLY M. KIRBY, JUDGE